UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ENID ROCHE,                                   :

              Plaintiff,            :            17 Civ. 4524 (AJP)

       -against-                  :            **OPINION & ORDER**

NANCY A. BERRYHILL,                           :
Acting Commissioner of Social Security,
                                              :

          Defendant.              :

                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**ANDREW J. PECK, United States Magistrate Judge:**

          Plaintiff Enid Roche, represented by counsel, brings this action pursuant to § 205(g)

of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner

of Social Security denying her application for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI").  (Dkt. No. 1: Compl.)  Presently before the Court are the

parties' cross motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  (Dkt. No. 17:

Roche Notice of Mot.; Dkt. No. 21: Comm'r Notice of Mot.)  The parties have consented to decision

of the case by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Dkt. No. 15.)

          For the reasons set forth below, the Commissioner's motion for judgment on the

pleadings (Dkt. No. 21) is <u>GRANTED</u> and Roche's motion (Dkt. No. 17) is <u>DENIED</u>.

**FACTS**

**Procedural Background**

          Roche filed for DIB and SSI on December 23, 2013 and January 29, 2014,

respectively, alleging a disability onset date of October 28, 2013.  (Dkt. No. 16: Administrative

Record ("R.") 213, 217.)  Roche's benefits application was denied on March 19, 2014 (R. 105, 116),

and she requested a hearing before an Administrative Law Judge ("ALJ") on May 16, 2014 (R. 143-45).  On January 6, 2016, Roche, represented by counsel, had a hearing before ALJ Michael Stacchini (R. 70-104), who denied Roche's benefits application in a written decision issued March 24, 2016 (R. 21-44).  ALJ Stacchini's decision became the Commissioner's final decision when the Appeals Council denied review on May 12, 2017.  (R. 1-3.)

**Non-Medical Evidence and Testimony[1]**

Born on July 3, 1967, Roche was 46 years old at the alleged October 28, 2013 onset of her disability.  (R. 213, 217.)  Roche previously worked as a home health aide, security guard and restaurant supervisor.  (R. 272, 280.)

In a January 21, 2014 function report (R. 259-71), Roche stated: "All I do is stay in bed and watch TV unless I have a doctor's appointment."  (R. 260.)  Roche stated that her impairments prevented her from "work[ing], . . . walk[ing] for long periods of time or sit[ting], . . . heavy lifting, stand[ing] up for too long, [and completing] house chores."  (R. 260.)  Roche stated that she could not sleep at night unless she was "heavily medicated," and that her back pain impaired her ability to dress, bathe, shave and use the bathroom.  (R. 260-61.)  Roche prepared her own meals daily, including "rice, chicken, pasta, salads, [and] tacos," but did no household chores or shopping as they caused "too much [back] pain to do alone."  (R. 261-63.)  Roche wrote that she went outside once a week "only for appointments," and that her only hobby/interest was watching television "all day."  (R. 262-63.)

Roche stated that lifting, standing, walking, sitting, climbing stairs, kneeling,

---

[1]    As Roche only challenges ALJ Stacchini's analysis regarding her physical impairments (see generally Dkt. No. 18: Roche Br.), the Court does not discuss the records or testimony relating to Roche's mental impairments.

squatting, reaching and using her hands caused her pain (R. 264-65), and that she used a back brace/splint when walking (R. 265-66). Roche stated that she suffered from lower back pain that radiated to her legs and upper back. (R. 267-68.) Roche could walk for 20 minutes before needing to stop and rest for five to ten minutes, and could not finish what she started because she needed "to stop and rest or leave it for [the] next day." (R. 266.) Roche stated that her "pain ha[d] gotten more severe over time," she experienced pain "all day" "every day," and it was exacerbated by "everything," including "walking, chores, bending, [and] lifting." (R. 268.)

In a February 4, 2014 function report (R. 288-300), Roche stated that her daily activities included watching television, laying in bed and relaxing (R. 289). Roche stated that her impairments prevented her from "work[ing], stand[ing], bend[ing], lift[ing], . . . clean[ing]" and sleeping through the night. (R. 289.) However, in contrast to her January 21, 2014 function report, Roche stated that her impairments caused her "no problem with personal care." (Id.) Roche prepared her own meals four to eight times a week, including "Spanish food, American, Chinese, [and] Italian," but could not do any household chores or shopping "without being in extreme pain." (R. 290-92.) Roche stated that she went outside once or twice a week and either walked or used public transportation when doing so. (R. 291.) Later in the report, Roche stated that she went to the doctor's office and deli two to three times per week. (R. 293.)

Roche stated that lifting, standing, walking, sitting, climbing stairs, kneeling, squatting, reaching and using her hands caused her pain. (R. 293-94.) Roche wrote that she used a back brace "all the time" to mitigate her pain. (R. 294-95.) Roche said she could walk for 15 minutes before needing to stop and rest for five minutes. (R. 295.) Roche wrote that she was "in pain all day every day" due to her lower back pain that radiated to her legs and upper back. (R. 296-97.) Roche stated that her pain had increased in severity over time "from 7 to 10," and it was

exacerbated by "everything except laying down." (R. 297.)

Roche had a hearing before ALJ Stacchini on January 6, 2016. (R. 70-104.) Roche testified that her daughters ran errands for her and that she did not "go around anywhere, honestly." (R. 77.) Roche had not been to the grocery store in three years, and the only errand she performed during that time was to check her mailbox. (R. 78.) Roche had not used public transportation since October 2013, and did no chores except feed her cat and "very light" cleaning such as wiping the counter. (R. 78-80.) Roche's activities included caring for her two cats, watching "[a] lot of TV," "sleep[ing] a lot because of [her] meds" (R. 81), and walking "around the block" once or twice a month (R. 82-83).

Roche stated that, besides making coffee and toast, she had not cooked a meal since October 2013, and relied on her daughter to bring her meals. (R. 80.) On examination by her attorney, Roche clarified that she prepared food in the microwave for herself, but that she did not consider microwaving food to be cooking. (R. 93-94.) ALJ Stacchini asked whether making "Spanish food, American food[,] . . . Chinese food, [and] Italian food" would be considered cooking, to which Roche responded, "Yeah." (R. 94.) ALJ Stacchini responded: "And that's what you listed though, [that] you prepare [food] eight to four times a week in your function report which you prepared in 2014." (Id.; see also R. 290-92.) Roche responded that she "believe[d] [she] did cook one time for [her] kids" in 2014, but could not "remember what day and what month." (R. 94.)

Roche testified that she suffered from lower back pain "[a]ll the time" that radiated down her legs; "the only time" Roche felt some relief from the pain was when she laid down. (R. 83.) However, Roche stated that her spinal cord stimulator also helped alleviate her pain from "an 11" to a six or seven. (R. 83-85.) Roche nonetheless used a cane to ambulate and help maintain her balance. (R. 85.) Roche also stated that, even with the spinal cord stimulator, she could not "sit at

a desk for most of the day" because she could only sit for 20 minutes before having to get up and walk around. (R. 95.) Nor could Roche perform a job that required constant standing due to her pain. (Id.) Roche stated that her pain interfered with her "focus and concentration" "[o]ften enough," and that she could not sleep through the night. (R. 95-96.) Roche additionally complained of right hand arthritis, which prevented her from carrying anything with that hand. (R. 92.)

Vocational expert Robert Baker also testified at the hearing before ALJ Stacchini. (R. 97.) ALJ Stacchini asked Baker the following hypothetical question:

> [A]ssume a hypothetical individual of [Roche's] age, education and work experience, able to do the full range of sedentary work except that she would be limited to up to occasional climbing ramps and stairs, but no climbing ladders, ropes or scaffolds and occasional balance, stoop, kneel, crouching and crawling. She would be limited to frequent right handling and frequent right fingering. She should avoid unprotected heights and hazardous machinery.
> . . . .
>
> She should also avoid atmospheric conditions . . . and would be limited to understanding, remembering and carrying out simple, routine tasks with up to occasional interaction with the general public, coworkers and supervisors.

(R. 98-99.) ALJ Stacchini remarked: "Based on that hypothetical . . . I can't imagine [Roche] could do her past work." (R. 99.) However, ALJ Stacchini asked whether there was "other work in the national economy that" Roche could perform. (Id.) Baker responded that Roche could perform the unskilled sedentary positions of addresser, document preparer, and cutter and paster, all of which existed in significant numbers in the national economy. (R. 99-100.)

ALJ Stacchini next asked whether Roche could perform these jobs if, in addition to the limitations in the hypothetical, Roche "was permitted to use a cane for uneven terrain and prolonged ambulation, that being greater than a city block." (R. 100.) Baker responded that the additional limitation "wouldn't be an impediment to this work," because the positions involved "office based work" without any "uneven ground . . . [and] minimal standing." (Id.) However,

Baker stated that Roche would be precluded from all work if she were further limited to being "off task for 20% of the work period in addition to regularly scheduled breaks." (Id.) Alternatively, Roche would be precluded from all work if she also was "limited to four hours of sitting and only one hour of standing and walking in an eight-hour workday." (Id.)

## Medical Evidence Before the ALJ

### Dr. Julia Kaci

Roche attended a consultative internal medicine evaluation with Dr. Julia Kaci of North Disability Services on February 14, 2014. (R. 488-92.) Roche stated that her low back pain had worsened in the past two years, and that physical therapy and epidural injections provided some relief. (R. 488.) Roche described her pain as constant, six out of ten, radiating down both legs with numbness and burning in the left leg. (Id.)

Roche claimed that sitting, standing for more than an hour and a half, and walking more than an hour caused her pain. (Id.) Roche stated that she could "not do any bending or lifting at all" as they increased her back pain. (Id.) Roche also complained of intermittent neck pain triggered by walking that began in 2013, which she rated a 7/10 in intensity. (Id.) Roche cooked three times a week, cleaned once a month, showered twice a week, dressed herself four times a week, and went to doctor's appointments. (R. 489-90.) Roche, however, could not do laundry, shop or bathe because of her back pain. (Id.)

Roche appeared in no acute distress, had a normal gait and stance, could walk on heels with difficulty (but not toes because of back pain) and fully squat, used no assistive devices, needed no help changing or getting on and off of the examination table, and could rise from her chair without difficulty. (R. 490.) Roche had full flexion, extension, rotary movement and lateral flexion bilaterally in her cervical spine; no scoliosis, kyphosis or abnormality in the thoracic spine;

and full lateral flexion bilaterally, but limited flexion, extension and lateral rotation of 30 degrees in her lumbar spine.  (R. 491.)

Roche's straight leg raise test was positive at 45 degrees on the right and 30 degrees on the left in the supine and sitting positions.  (Id.)  Roche had full range of motion in her shoulders, elbows, forearms and wrists bilaterally; full range of motion in her hips, knees and ankles bilaterally; and no evident subluxations, contractures, ankylosis or thickening.  (Id.)  Roche's joints were stable and non-tender with no redness, heat, swelling or effusion, and no cyanosis, clubbing, edema or muscle atrophy was evident in Roche's extremities.  (Id.)  Roche's hand and finger dexterity were intact and her grip strength was 5/5 bilaterally, but her upper and lower extremity strength was 4/5. (Id.)  Roche's deep tendon reflexes were "physiologic and equal in [her] upper and lower extremities," with no sensory deficit.  (Id.)  Dr. Kaci noted that Roche's February 14, 2014 lumbosacral spine x-ray showed "no significant bony abnormality," and her cervical spine x-ray the same day showed "disc space narrowing at C5-C6."  (Id.; see also R. 494-95.)

Dr. Kaci concluded that Roche's prognosis was stable, and diagnosed Roche with "[c]hronic low back pain with history of disc herniations and left sciatica," "[c]hronic neck pain with history of disc herniations" and spinal arthritis, among other conditions.  (R. 492.)  Dr. Kaci opined that Roche had mild limitations sitting and standing, moderate limitations walking and marked limitations bending, lifting and carrying.  (Id.)  Dr. Kaci wrote that Roche also should avoid heights because of her history of vertigo and known respiratory irritants because of her asthma.  (Id.)

**Dr. Christopher Lee**

Roche's June 11, 2012 lumbar spine MRI revealed a maintained lumbar lordosis, mild L4-L5 and moderate to marked L5-S1 degenerative disc space narrowing, discogenic vertebral endplate sclerosis at L5-S1, and minimal to mild bilateral L4-L5 and L5-S1 degenerative facet

hypertrophy. (R. 510.) The MRI further revealed "a very small central L4-L5 disc herniation . . . with minimal thecal sac indentation," "diffuse degenerative disc bulging at the L5-S1 level," and mild to moderate L5-S1 foraminal narrowing bilaterally secondary to degenerative disc bulging with spondylosis. (Id.) No central canal stenosis was observed. (Id.) The reviewing physician's impression stated: "Prominent degenerative disc space narrowing is seen at the L5-S1 level. There is a very small central L4-L5 disc herniation. [M]ild to moderate right and mild left L5-S1 foraminal narrowing is seen." (Id.)

Roche's February 14, 2014 lumbosacral spine x-ray revealed no significant bony abnormality, and showed that the height of the vertebral bodies and intervertebral disc spaces were relatively well maintained. (R. 494.) Roche's cervical spine x-ray the same day revealed "narrowing of the C5-C6 disc space" and "straightening," but "no compression fracture." (R. 495.)

On January 9, 23 and February 11, 2014, Roche received a lumbar transforminal epidural steroid injection from Dr. Christopher Lee (R. 500, 503, 505), and, after the latter two injections, she reported 60% relief but still experienced some pain (R. 499, 502).

On March 7 and May 13, 2014, Roche complained of back and thigh pain. (R. 496-97.) Roche had cervical paraspinal muscle spasms, moderate lumbar paraspinal tenderness/spasms, limited cervical and lumbar spine flexion and extension, a positive straight leg raise test on the left, and diminished +1 deep tendon reflexes throughout her bilateral upper and lower extremities. (Id.)[2] However, Roche had 5/5 strength throughout, a normal gait and a "[s]ensory examination demonstrate[d] intact pinprick and light touch sensation of bilateral upper and lower extremities." (Id.) During the latter visit, Dr. Lee diagnosed Roche with lumbar

---

[2]    See https://informatics.med.nyu.edu/modules/pub/neurosurgery/reflexes.html.

displaced disc at L4-L5, lumbar degenerative facet hypertrophy and lumbar radiculopathy at L5-S1. (R. 507.)  Dr. Lee referred Roche to neurosurgeon Dr. Yassari for further evaluation.  (Id.)

### Dr. Sharon Welch-Philip

On February 24, 2015, Dr. Sharon Welch-Philip completed a Municipal Housing Authority Disability Exemption Verification Form in which she checked boxes indicating that Roche was permanently disabled.  (R. 616.)

On May 19, 2015, Dr. Welch-Philip wrote a "To Whom It May Concern" letter stating that Roche had a history of degenerative disc disease with disc protrusion and, as a result, was "unable to work due to severe pain and limitation of movement."  (R. 618.)

### Drs. Binod Shah and Arefin Siddique

On July 21, 2014, Roche presented to Dr. Binod Shah for a left trochanteric bursa steroid injection to alleviate the pain from her left sided trochanteric bursitis.  (R. 688.)

On September 8, 2014, Roche underwent a lumbar spine MRI due to her lower back pain.  (R. 686-87.)  The MRI revealed maintenance of the normal lumbar lordosis and normal vertebral body heights.  (R. 686.)  At L1-L4, the diameter of the spinal canal was within normal limits, the dural sac was normal, the epidural fat planes were preserved and the intervertebral foramen were patent.  (Id.)  At L4-L5, the MRI revealed disc desiccation, minimal decreased disc space height, and a "[d]orsal disc-osteophyte complex protrusion, centrally compress[ing] the ventral portion of the dural sac and narrow[ing] each intervertebral foramen, compressing the origin of each exiting L5 root."  (Id.)  At L5-S1, disc desiccation, "diffuse and severe" decreased disc space height and a dorsal disc-osteophyte complex protrustion that broadly compressed the ventral portion of the dural sac and narrowed each intervertebral foramen were observed.  (R. 687.)  No paraspinal masses were found.  (Id.)  The reviewing physician reiterated in the impression section of the report that

Roche had a central disc protrusion and severe degenerative disc disease at L5-S1. (Id.)

On November 3, 2014, Roche underwent a lumbar facet denervation to relieve her lower back pain and left sided lumbar arthropathy. (R. 685.)

On January 21, 2015, Roche complained of constant 10/10 lower back pain radiating to her lower extremities with numbness and tingling. (R. 683.) Roche was in distress, but had normal motor and sensory function, intact and symmetrical deep tendon reflexes bilaterally and a normal gait. (R. 684.) In the lumbar spine, Roche had a positive facet loading test bilaterally, limited range of motion on flexion, extension and rotation bilaterally due to pain, and her paraspinal muscles were tender and had spasms. (Id.)

On February 20, 2015, Roche complained of 10/10 lower back pain radiating to her legs, aggravated by waking, standing, sitting, movement and lifting, and relieved by medication and lying down. (R. 681.) Roche was well developed, had normal motor and sensory function, intact and symmetrical deep tendon reflexes bilaterally and a normal gait. (R. 682.) In the lumbar spine, Roche had a positive facet loading test bilaterally, limited range of motion on flexion, extension and rotation bilaterally due to pain, and her paraspinal muscles were tender and had spasms. (Id.)

On March 2, 2015, Roche received an epidural lumbar steroid injection to relieve her lower back pain and left sided lumbar radiculopathy. (R. 680.)

On May 19, 2015, Roche complained of constant 9/10 lower back pain with numbness and tingling radiating to her lower extremities. (R. 677.) Roche stated that epidural injections did not help. (Id.) On June 19, 2015, Roche saw Dr. Arefin Siddique and complained of 9/10 lower back pain radiating to both legs aggravated by walking, standing and sitting, and relieved by medication and lying down. (R. 673.) On July 28 and August 25, 2015, Roche presented with constant 10/10 lower back pain with numbness and tingling radiating to her lower extremities. (R.

669, 671.) Roche again stated that her lower back epidural injections resulted in "no improvement." (Id.)

On May 19, June 19, July 28 and August 25, 2015, Roche appeared alert and in no distress. (R. 670, 672, 674, 678.) Roche moved her extremities well, no abnormalities were noted in her motor and sensory function, and she had intact, symmetrical deep tendon reflexes bilaterally and a normal gait (id.), although on May 19, July 28 and August 25 she ambulated with a cane (R. 670, 672, 678). At all four visits, Roche's cervical spine was unremarkable, but in the lumbar spine she had a positive facet loading test bilaterally, and limited range of motion on flexion, extension and rotation bilaterally due to pain. (R. 670, 672, 674, 678.) Roche's straight leg raise test also was positive bilaterally, and her paraspinal muscles were tender and had spasms. (Id.)

On December 22, 2015, Roche complained of constant 8/10 right hand pain with numbness and tingling. (R. 667.) Roche appeared well developed, well nourished, with normal motor and sensory function, intact and symmetrical deep tendon reflexes bilaterally and a normal gait. (R. 668.)

On January 5, 2015, Dr. Shah completed a physical functional capacity assessment. (R. 743-49.) Dr. Shah wrote that Roche's primary problems were lower back pain and lumbar radiculopathy resulting in constant pain and fatigue. (R. 743.) Dr. Shah wrote that "activities" precipitated the pain, which reached up to a 10/10 in severity. (R. 744.)

Dr. Shah opined that Roche could walk one to two blocks without rest, could sit and stand for no longer than 30 minutes, and could walk for no longer than one hour. (R. 746.) In an eight-hour workday, Roche could sit, stand and walk for less than one hour total. (Id.) Roche would need to take unscheduled breaks during an eight-hour workday for 15-20 minutes every 20-30 minutes. (Id.) Roche also would need to lie down or rest at unpredictable intervals during an eight-

hour workday for 30-45 minutes every two to three hours. (R. 747.) Roche required a cane when engaging in occasional standing or walking, depending on the severity of her pain. (Id.)

Dr. Shah further opined that Roche could lift and carry no more than five pounds occasionally (i.e., less than 1/3 of an eight hour day). (Id.) However, Dr. Shah did not indicate that Roche had any limitations in the use of her hands, fingers, arms or neck, or in bending or twisting her body at the waist. (R. 747-48.) Dr. Shah did not complete the portions of the form asking whether Roche would have good and bad days, or how often she would be absent from work due to her impairments. (R. 748.) Dr. Shah opined that Roche's symptoms had lasted or could be expected to last at least 12 months, and that her impairments were reasonably consistent with the symptoms and functional limitations described in the remainder of his evaluation. (R. 745.)

**Montefiore Medical Center**

On June 15, 2015, Roche had an initial evaluation with Dr. Andrew Gitkind regarding her chronic low back pain, which was increased by sitting, standing, bending and twisting. (R. 905.) Roche stated that she "had back pain for over 5 years and . . . had various attempts at conservative management but without any long-term symptomatic relief," and that "[l]ast year she had . . . 5 epidural steroid injections which did not afford her any significant relief." (Id.) Roche further stated that physical therapy had made her pain worse. (Id.)

Dr. Gitkind noted that Roche was recently seen by neurological surgeon Dr. Reza Yassari who, after reviewing Roche's spinal imaging, determined that she was not an appropriate surgical candidate. (R. 906.) Roche therefore was referred to Dr. Gitkind "for evaluation for a trial of spinal cord stimulation." (Id.)

Roche was well developed and in no acute distress, but had pain and restricted movement in her lumbar spine. (R. 908.) Roche's facet load test was positive on the left, and she

had paraspinal rigidity bilaterally.  (Id.)  An MRI of Roche's lumbar spine revealed "[l]umbar spondylosis without frank compression of the neural elements."  (R. 908-09.)

On July 15, 2015, Roche attended a follow up visit with Dr. Gitkind "5 days after implantation of a trial spinal cord stimulation."  (R. 900.)  Roche reported that she was in no pain, and had "been virtually pain-free" during the five day trial; Roche stated "that her activity level ha[d] significantly improved as [did] her overall mood."  (Id.)  Roche had not used any pain medication or an assistive device when walking during the trial.  (Id.)  Roche stated that she was anxious to proceed with the permanent implantation of the stimulator.  (Id.)  Dr. Gitkind concluded that Roche was "an excellent candidate for permanent implantation," and scheduled Roche to see Dr. Yassari to discuss the procedure.  (R. 903.)

On August 27, 2015, Roche attended an appointment with Dr. Yassari to discuss the permanent implantation.  (R. 691.)  Roche stated that "[w]ith the trial in place she fe[lt] 65% better, ha[d] improved balance and gait, [and could] ambulate and perform her ADLs significantly better." (Id.)  Roche also had decreased her medication usage during the trial.  (Id.)  Dr. Yassari stated that he would schedule Roche for the permanent implantation procedure.  (See R. 692-93.)

On September 25, 2015, Roche underwent permanent spinal cord stimulator insertion surgery, performed by Drs. Yassari and Gitkind.  (R. 718-19.)  On October 28, 2015, Roche had a post-operative physical examination, during which she reported that she was "doing very well," was "very happy" and was in no pain.  (R. 742.)

**ALJ Stacchini's Decision**

On March 24, 2016, ALJ Stacchini denied Roche's application for benefits.  (R. 21-44.)  ALJ Stacchini applied the appropriate five step legal analysis.  (R. 28-29.)  First, ALJ Stacchini found that Roche had "not engaged in substantial gainful activity since October 28, 2013,

the alleged onset date." (R. 29.) Second, ALJ Stacchini determined that Roche had "the following severe impairments: cervical and lumbar degenerative discogenic disease, asthma, obesity, right hand osteoarthritis, and depressive, bipolar and panic disorders." (Id.)

Third, ALJ Stacchini found that Roche did "not have an impairment or combination of impairments that me[t] or medically equal[ed] the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1," "including Listing[] 1.00, Musculoskeletal System." (R. 31.) ALJ Stacchini wrote that "[t]he severity of [Roche's] lumbar spine disorder did not satisfy the criteria set forth by Listing 1.04 Disorders of the Spine," because "[t]he record did not demonstrate functional loss that resulted in inability to ambulate effectively." (Id.) Although Roche "reported using a cane as she alleged losing her balance," in August 2015, treating neurosurgeon "Dr. Yassari . . . reported that [Roche] improved her balance and gait, can ambulate and perform her activities of daily living significantly better." (Id.) Moreover, "Dr. Kaci's findings in February 2014 did not establish abnormalities in gait." (Id.) ALJ Stacchini concluded: "Thus, the lumbar spine disorder, as confirmed by a lumbar [MRI] study, did not interfere very seriously with [Roche's] ability to independently initiate, sustain or complete activities." (Id.)

ALJ Stacchini next found that Roche's right hand osteoarthritis "did not satisfy the criteria set forth by Listing 1.02, Major Dysfunction of a joint or 14.09, Inflammatory Arthritis." (R. 31.) Roche "did not have inability to perform fine and gross movements effectively on a sustained basis, including her alleged pain symptoms with tenderness to palpation." (Id.) Roche also "had intact hand functioning during the consultative examination performed in February 2014." (Id.) ALJ Stacchini concluded: "Because the record did not document inability to perform fine and gross movements effectively, the cervical spine disorder, as confirmed by an x-ray, did not satisfy the listing criteria set forth by Listing 1.04. From a physical standpoint, Dr. Kaci reported a full

range of motion in the neck and no upper extremity restrictions to support the extent of the alleged

neck pain with radicular symptoms." (R. 31.)

> ALJ Stacchini found that Roche had the residual functional capacity ("RFC") to:
>
> perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that she can occasionally climb stairs and ramps, and never climb ladders or scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. She needs to avoid unprotected heights, moving mechanical parts and atmospheric conditions. She can frequently handle and finger with her right hand. She is limited to simple and routine tasks with occasional interaction with coworkers, supervisors and the general public.

(R. 33.)

> ALJ Stacchini noted that Roche stated in her function reports that she spent her days

in bed sleeping, and testified at the hearing that "she had not prepared any meals or cleaned at all

since October of 2013." (R. 34.) However, ALJ Stacchini found that these statements were "not

consistent with other statement[s] in the record." (Id.) Roche admitted to cooking three times per

week in her function report and during her consultative examination with Dr. Kaci, and Dr. Kaci

found that Roche "remained independent in her personal care needs even though she complained

of difficulties." (Id.) Roche's treatment records with other physicians also indicated that she was

"able to complete her activities of daily living and perform household chores." (Id.)

> Although Roche alleged limited mobility and difficulty walking, Dr. Kaci reported

that Roche had a normal gait and stance, and had no difficulty changing for the examination or

getting on and off of the examination table. (Id.) ALJ Stacchini accordingly found that Roche's

"allegations that she could walk for up to 10 minutes with rest periods of up to 20 minutes [we]re

not persuasive." (Id.)

> ALJ Stacchini found that Roche's obesity, considered with Roche's other impairments

including her spine disorder, imposed no additional restrictions. (Id.) ALJ Stacchini nevertheless

considered Roche's obesity in determining her RFC.  (Id.)

Next, ALJ Stacchini found that Roche could frequently handle and finger with her dominant right hand.  (Id.)  ALJ Stacchini wrote that Roche "had right hand osteoarthritis changes as of December 2015 to support her allegations of right hand pain," but Dr. Kaci found that Roche "had intact hand and finger dexterity, full strength on grip, and no restrictions in the range of motion of her shoulders, elbows, forearms and wrists[] bilaterally."  (Id.)  Dr. Kaci, moreover, included no limitations in hand functioning.  (Id.)

Roche further alleged neck pain, but Dr. Shah's examination findings in January, February, June, August and December 2015 "did not establish abnormalities, consistent with Dr. Kaci's findings of February 2014."  (Id.)  "Dr. Kaci reported no restrictions in the range of motion despite the radiological findings that revealed narrowing at the C5/C6 level."  (Id.)  Dr. Kaci "observed symmetrical reflexes and no motor or sensory abnormalities" were reported in Roche's physical examinations with Dr. Shah.  (R. 34-35.)

ALJ Stacchini nevertheless acknowledged that the laboratory findings regarding Roche's cervical spine supported her neck pain allegations, but did "not support the intensity of her alleged symptoms or radicular pain in the upper extremity."  (R. 35.)  Dr. Kaci wrote that Roche had full range of motion in her neck, joints and upper extremities including her shoulders, elbows, forearms and wrists bilaterally.  (Id.)  However, Dr. Kaci observed decreased strength in Roche's upper extremities rated a 4/5, which supported some decreased capacity to exert force.  (Id.)  ALJ Stacchini addressed this limitation by limiting Roche to a range of sedentary work.  (Id.)

ALJ Stacchini next noted that Roche claimed that she could not lift anything heavier than ten pounds in her Appeals Disability Report (R. 302), which conflicted with Dr. Shah's opinion that Roche could only occasionally lift up to five pounds (R. 35).  Dr. Shah's opinion on Roche's

ability to lift was given little weight as Roche "admitted she could lift heavier objects, equivalent to sedentary work." (R. 35.)

As to Roche's allegations of severe back pain, stiffness and muscle spasms, ALJ Stacchini gave "little weight" to Dr. Kaci's opinion that Roche had a marked limitation bending, lifting and carrying. (Id.) ALJ Stacchini wrote that Dr. Kaci's restriction was vague and inconsistent with her examination findings. (Id.) ALJ Stacchini found that Roche could "occasionally stand and/or walk for up to 2 hours of an 8-hour workday, consistent with the sedentary level of exertion." (Id.)

ALJ Stacchini expanded on his reasoning, noting that "[s]ubsequent laboratory studies support[ed] the presence of degenerative changes" attributable to Roche's symptoms. (Id.) Roche's September 2014 MRI revealed a normal lordosis and no abnormalities in the vertebral body heights, but also revealed minimal decreased disc spaces at L4/L5, an osteophyte complex with compression of the L5 nerve root and degenerative changes at L5/S1. (Id.) In August 2015, another MRI indicated that Roche had multilevel spondylosis. (Id.) However, while Roche used a cane in May, July and August 2015, she underwent a spinal cord stimulator procedure in August 2015 and, "[t]hereafter, the evidence reveal[ed] that she was responsive to treatment." (R. 36.) Roche reported "that she could ambulate and perform her activities of daily living significantly better," and "had a decrease in the use of narcotic pain medication." (Id.) "By October 2015, a physical examination, post-operation, revealed that [Roche] had no pain, was doing very well and was happy." (Id.)

ALJ Stacchini also stated that Roche alleged that she had degenerative changes in her lower extremities, and limitations climbing stairs, kneeling and squatting. (Id.) However, Dr. Kaci's examination did not reveal joint instability, redness, heat, swelling or effusion, and Roche had full range of motion in her lower extremity joints. (Id.) ALJ Stacchini wrote that aside from

positive straight leg raise tests bilaterally at 45 degrees on the right and 30 degrees on the left, "the evidence did not support a sensory deficit." (Id.) The records showed that Roche had some decrease in strength bilaterally, which was consistent with Dr. Shah's findings, but Dr. Shah reported a positive straight leg raise test at 50 degrees bilaterally "with greater functionality as compared to Dr. Kaci's findings." (Id.) Thus, considering Dr. Kaci's and Dr. Shah's findings, ALJ Stacchini found that Roche could occasionally climb stairs and ramps, and never climb ladders or scaffolds, due to the degenerative changes in her lower extremities. (R. 36-37.)

However, ALJ Stacchini found that Dr. Kaci's conclusion that Roche had marked limitations bending was inconsistent with the evidence. (R. 37.) Dr. Kaci observed that Roche had full lateral flexion bilaterally, with limited forward flexion and extension at 30 degrees. (Id.) Dr. Shah reported no neurological deficits and described Roche as alert and in no acute distress, and in September 2015, Dr. Yassari reported that Roche's symptoms had improved. (Id.) Thus, ALJ Stacchini wrote that the record did not support a marked bending limitation, and that Roche could occasionally stoop. (Id.)

As for the opinion evidence, ALJ Stacchini gave Dr. Shah's December 2015 "medical source statement with significant restrictions . . . little weight." (R. 36.) ALJ Stacchini wrote that Dr. Shah opined that Roche was limited to thirty minutes of sitting, and between thirty minutes and an hour of standing and/or walking, before needing to change positions. (Id.) However, ALJ Stacchini gave "little weight" to this portion of Dr. Shah's opinion because it was not supported by his own examination findings or Dr. Siddique's June 2015 examination. (Id.) Roche repeatedly had "symmetrical deep tendon reflexes," and ALJ Stacchini found that "the extreme findings" were inconsistent with other evidence showing that Roche was "independent with her activities of daily living" and responded well to treatment. (Id.)

ALJ Stacchini also discussed Dr. Welch-Philip's February 2015 medical certificate in which she opined that Roche was permanently disabled. (Id.) ALJ Stacchini gave Dr. Welch-Philip's opinion "little weight" because it was conclusory and inconsistent with the medical evidence demonstrating a decrease in Roche's symptoms with her prescribed course of treatment. (Id.) Dr. Welch-Philip's "opinion did not include medical signs or laboratory findings to provide a supportive explanation for her conclusion," and she "rendered an opinion dispositive of a case and [on] an issue reserved to the Commissioner." (Id.) Moreover, the record did not include a statement from Dr. Welch-Philip regarding Roche's functional limitations. (Id.)

ALJ Stacchini next found that although Roche's medically determinable impairments could be expected to produce the alleged symptoms, Roche's statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely credible. (R. 41.) ALJ Stacchini found that Roche's neck and back pain "did not limit her to the extent alleged." (Id.) "The record reveal[ed] that Roche had pain symptoms that prompted her to have epidural injections and surgery for a spinal cord stimulator which resulted in good control of her symptoms." (Id.) The medical records indicated that Roche's neck pain was intermittent, and that she did not have significant upper extremity limitations "as she had full range of motion in the movement of her shoulders, elbows, forearms or wrists." (Id.) While Roche "had a history of right hand osteoarthritis, the record did not establish restrictions in hand functioning consistent with Dr. Kaci's examination." (Id.) ALJ Stacchini concluded that Roche retained the capacity to engage in sedentary work subject to certain limitations. (R. 42.)

ALJ Stacchini next determined that Roche could not perform her past relevant work as a home health aide, security guard and restaurant supervisor, but was a younger individual with some education who spoke English. (R. 42-43.) Considering Roche's "age, education, work

experience, and residual functional capacity," ALJ Stacchini concluded that there were jobs that Roche could perform, including those identified by vocational expert Robert Baker such as the unskilled sedentary positions of addresser, document preparer, and cutter and paster, all of which existed in significant numbers in the national economy.  (R. 43-44.)  ALJ Stacchini accordingly concluded that Roche had "not been under a disability, as defined in the Social Security Act, from October 28, 2013, through the date of [his] decision," March 24, 2016.  (R. 44.)

## ANALYSIS

## I.     THE APPLICABLE LAW

### A.     Definition Of Disability

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856, 857 (2d Cir. 2012).[3/]

An individual shall be determined to be under a disability only if [the combined

---

[3/]     See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

> effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270.[4/]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[5/]

B.     **Standard Of Review**

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support such determination. E.g., 42 U.S.C. § 405(g); Giunta v. Comm'r of Soc. Sec., 440 F. App'x 53, 53 (2d Cir. 2011).[6/] "'Thus,

---

[4/]    See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472; Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

[5/]    See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62.

[6/]    See also, e.g., Prince v. Astrue, 514 F. App'x 18, 19 (2d Cir. 2013); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (continued...)

the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision.'" Morris v. Barnhart, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[7]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[8] "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983). The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[9]

---

[6]    (...continued)
(2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).

[7]    See also, e.g., Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

[8]    See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[9]    See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312
(continued...)

The Court, however, will not defer to the Commissioner's determination if it is "'the product of legal error.'" E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir. 2012); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987). The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability. If at any step a finding of disability or nondisability can be made, the SSA will not review the claim further. [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity." [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted).[10]

---

[9]   (...continued)
F.3d at 586.

[10]   Accord, e.g., Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Rosa v. Callahan, 168
(continued...)

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training.  See, e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[11/]

### C.     The Treating Physician Rule

The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2); see, e.g., Rugless v. Comm'r of Soc. Sec., 548 F. App'x 698, 699-700 (2d Cir. 2013); Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010); Colling v. Barnhart, 254 F. App'x 87, 89 (2d Cir. 2007); Lamorey v. Barnhart, 158 F. App'x 361, 362 (2d Cir. 2006).

Further, the regulations specify that when controlling weight is not given a treating physician's opinion (because it is not "well-supported" by other medical evidence), the ALJ must

---

[10/]     (...continued)
F.3d at 77; Tejada v. Apfel, 167 F.3d at 774;  see also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

[11/]     See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

consider the following factors in determining the weight to be given such an opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant.  20 C.F.R. § 404.1527(c)(2)-(6); see, e.g., Cichocki v. Astrue, 534 F. App'x 71, 74 (2d Cir. 2013); Gunter v. Comm'r of Soc. Sec., 361 F. App'x 197, 197 (2d Cir. 2010).[12]

When a treating physician provides a favorable report, the claimant "is entitled to an express recognition from the [ALJ or] Appeals Council of the existence of [the treating physician's] favorable . . . report and, if the [ALJ or] Council does not credit the findings of that report, to an explanation of why it does not."  Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999); see, e.g., Cichocki v. Astrue, 534 F. App'x at 75; Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (ALJ's failure to consider favorable treating physician evidence ordinarily requires remand pursuant to Snell but does not require remand where the report was "essentially duplicative of evidence considered by the ALJ"); Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("We of course do not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable [reviewing courts] to decide whether the determination is supported by substantial evidence." (citations omitted)); Ramos v. Barnhart, 02 Civ. 3127, 2003 WL 21032012 at *7, *9 (S.D.N.Y. May 6, 2003) (The ALJ's "'failure to mention such [treating physician report] evidence and set forth the

---

[12]    See also, e.g., Foxman v. Barnhart, 157 F. App'x 344, 346-47 (2d Cir. 2005); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998).

reasons for his conclusions with sufficient specificity hinders [this Court's] ability . . . to decide whether his determination is supported by substantial evidence.'").

The Commissioner's "treating physician" regulations were approved by the Second Circuit in Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993).[13]

## II.    APPLICATION OF THE FIVE STEP SEQUENCE

### A.    Roche Was Not Engaged In Substantial Gainful Activity

The first inquiry is whether Roche was engaged in substantial gainful activity after her application for benefits.  "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510.  ALJ Stacchini's conclusion that Roche did not engage in substantial gainful activity during the applicable time period (see pages 13-14 above) is not disputed and benefits Roche.  (See generally Dkt. No. 22: Comm'r Br.)  The Court therefore proceeds with the analysis.

### B.    Roche Demonstrated "Severe" Impairments That Significantly Limited Her Ability To Do Basic Work Activities

The second step of the analysis is to determine whether Roche proved that she had a severe impairment or combination of impairments that "significantly limit[ed her] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1522(b).  "Basic work activities" include:

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and

---

[13]    Although not relevant here, the Court notes that the regulations governing the "treating physician rule" recently changed as to claims filed on or after March 27, 2017.  See 20 C.F.R. §§ 404.1527, 404.1520c; Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, 2017 WL 168819 at *5844, *5867-68 (Jan. 18, 2017).

remembering simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations . . . [d]ealing with changes in a routine work setting.

20 C.F.R. § 404.1522(b)(1)-(6).

ALJ Stacchini determined that Roche's severe impairments were "cervical and lumbar degenerative discogenic disease, asthma, obesity, right hand osteoarthritis, and depressive, bipolar and panic disorders." (See page 14 above.) ALJ Stacchini's findings regarding the step-two severity of these impairments benefit Roche. Accordingly, the Court proceeds to the third step of the five-part analysis.

**C.      Roche Did Not Have A Disability Listed In Appendix 1 Of The Regulations**

The third step of the five-step test requires a determination of whether Roche had an impairment listed in Appendix 1 of the Regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits." Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995).

ALJ Stacchini found that notwithstanding Roche's severe impairments, she did "not have an impairment or combination of impairments that me[t] or medically equal[ed] the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1," "including Listing[] 1.00, Musculoskeletal System." (See page 14 above.) ALJ Stacchini wrote that "[t]he severity of [Roche's] lumbar spine disorder did not satisfy the criteria set forth by Listing 1.04 Disorders of the Spine," because "[t]he record did not demonstrate functional loss that resulted in inability to ambulate effectively." (See page 14 above.) Although Roche "reported using a cane as she alleged losing her balance," in August 2015, treating neurosurgeon "Dr. Yassari . . . reported that [Roche]

improved her balance and gait, can ambulate and perform her activities of daily living significantly better." (Id.) Moreover, "Dr. Kaci's findings in February 2014 did not establish abnormalities in gait." (Id.) ALJ Stacchini concluded: "Thus, the lumbar spine disorder, as confirmed by a[n] [MRI] study, did not interfere very seriously with [Roche's] ability to independently initiate, sustain or complete activities." (Id.)

Roche argues that ALJ Stacchini failed to properly assess whether Roche met Listing 1.04 by only discussing Listing 1.04(C), not 1.04(A). (Dkt. No. 18: Roche Br. at 12-16.) Roche further argues that this error warrants remand for calculation of benefits because it is likely that she meets the requirements of Listing 1.04(A). (Id. at 13-14.) The Commissioner responds that ALJ Stacchini "correctly analyzed [Roche's] impairment under Listing 1.04(C), and found that the evidence did not support a conclusion that she met the requirements of that Listing." (Dkt. No. 22: Comm'r Br. at 19.) The Commissioner argues that "the ALJ did not explicitly consider Listing 1.04(A) because there was no indication that [Roche] was close to meeting this listing." (Id.) The Court discusses Listing 1.04(A) below.

1.    **Listing 1.04: Disorders Of The Spine**[14]

For a disorder of the spine to be considered severe it must result "in compromise of a nerve root (including the cauda equina) or the spinal cord" with:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue

---

[14]    The Listing cited in this section of the opinion is the version that was in effect on March 24, 2016, the date of ALJ Stacchini's decision. (See page 13 above.)

biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.

Roche correctly argues (and the Commissioner concedes) that she meets many of the criteria set forth in Listing 1.04(A). (Dkt. No. 18: Roche Br. at 13; Dkt. No. 22: Comm'r Br. at 21 ("Here, some, but not all, of the Listing [1.04(A)] requirements are met.").) Specifically, Roche's September 2014 MRI revealed that she had an osteophyte complex with compression of the L5 nerve root, Dr. Shah found that Roche had limited range of motion in her spine on multiple occasions, and Drs. Kaci and Shah wrote that Roche had positive straight leg raise tests bilaterally. (See pages 7, 9-12 above.) However, as Roche concedes, less apparent from the records is evidence of "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A); see also Roche Br. at 13 ("The only questionable element of the Listing in Roche's medical record is the element of motor loss accompanied by sensory and reflex loss."). Roche, however, argues that Dr. Lee found "muscle weakness and diminished reflex on a number of occasions," Dr. Kaci "found decreased strength at the consultative exam" and Dr. Welch-Philip "found diminished reflexes as well," which "satisfy the remaining element of the Listing which does not require a particular level of weakness or reflex loss." (Roche Br. at 13.)

Roche is correct that some record evidence might satisfy the remaining criteria of Listing 1.04(A). Dr. Lee opined on two occasions that Roche had diminished +1 deep tendon

reflexes throughout her bilateral upper and lower extremities, and Dr. Kaci found that Roche's upper and lower extremity strength was 4/5, and that Roche could walk on heels with difficulty, but not toes because of back pain. (See pages 6-9 above); see 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.00(E)(1) ("Observations of the individual during the examination should be reported; e.g., how he or she gets on and off the examination table. Inability to walk on the heels or toes, to squat, or to arise from a squatting position, when appropriate, may be considered evidence of significant motor loss."). On May 19, 2015, Dr. Welch-Philip wrote a (conclusory) "To Whom It May Concern" letter stating that Roche had a history of degenerative disc disease with disc protrusion and, as a result, was "unable to work due to severe pain and limitation of movement." (See page 9 above.)

Given this evidence, ALJ Stacchini should have addressed Listing 1.04(A), if only to clarify that the weight of the evidence did not indicate that Roche met or equaled its criteria. Nevertheless, "in spite of the ALJ's failure to explain his rejection of the claimed listed impairments, [the Court was] able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence." Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982).[15/] ALJ Stacchini addressed Roche's motor, sensory and reflex loss in

---

[15/]    See also, e.g., Solis v. Berryhill, 692 F. App'x 46, 48 (2d Cir. 2017) (Plaintiff's "challenge to the ALJ's listing determination is meritless. Although the ALJ did not explicitly discuss Listing 11.14, his general conclusion (that [plaintiff] did not meet a listed impairment) is supported by substantial evidence."); Berry v. Schweiker, 675 F.2d at 467-68 ("The ALJ rejected these contentions [that plaintiff met the relevant Listing], stating: 'This Judge has reviewed all of the material medical evidence and the claimant's testimony and concludes that this claimant's conditions were not attended by clinical findings that meet or equal in severity the requirements of Appendix 1 (of the relevant regulations).' Unfortunately, the ALJ's otherwise thorough opinion failed to set forth a specific rationale in support of the foregoing conclusion. Nonetheless, the absence of an express rationale does not prevent us from upholding the ALJ's determination regarding appellant's claimed listed impairments, (continued...)

the remainder of his decision, which supports his determination that Roche "did not satisfy the severity criteria set forth by . . . Listing[] 1.00" or, more specifically, "Listing 1.04 Disorders of the Spine." (R. 31.)

ALJ Stacchini wrote that Roche alleged neck pain, but Dr. Shah's examination findings in January, February, June, August and December 2015 "did not establish abnormalities, consistent with Dr. Kaci's findings of February 2014." (See page 16 above.) "Dr. Kaci reported no restrictions in the range of motion despite the radiological findings that revealed narrowing at the C5/C6 level." (Id.) Dr. Kaci also observed full range of motion in Roche's upper extremities and "symmetrical reflexes[,] and no motor or sensory abnormalities" were reported in Roche's physical examinations with Dr. Shah. (See pages 7, 16 above.) ALJ Stacchini stated that Dr. Shah's records showed that Roche repeatedly had "symmetrical deep tendon reflexes" and that, aside from positive straight leg raise tests during Dr. Kaci's examination, "the evidence did not support a sensory deficit" although Roche had some decrease in strength bilaterally consistent with Dr. Shah's findings. (See pages 17-18 above.)

ALJ Stacchini's findings are supported by substantial evidence in the record. As ALJ Stacchini noted, Dr. Kaci's consultative examination report includes a number of normal findings.

---

15/     (...continued)
since portions of the ALJ's decision and the evidence before him indicate that his conclusion was supported by substantial evidence."); Mercado v. Berryhill, No. 15-CV-00282, 2017 WL 6275726 at *3 (W.D.N.Y. Dec. 11, 2017) ("If the ALJ does not provide reasons for rejecting a listed impairment, the Court may look to other parts of the decision and credible evidence in the record to determine if the rejection was supported by substantial evidence."); Scully v. Berryhill, 16 Civ. 7211, 2017 WL 4564926 at *6 (S.D.N.Y. Oct. 12, 2017) ("Instead of specifying why the medical evidence demonstrated that [plaintiff] did not meet this listing's requirements, the ALJ referred to 'the evidence detailed below.' This reference is permissible, provided the ALJ supports this determination elsewhere in his or her opinion." (record citation omitted)).

Dr. Kaci wrote that Roche appeared in no acute distress, had a normal gait and stance, could walk on heels with difficulty and fully squat, used no assistive devices, needed no help changing or getting on and off of the examination table, and could rise from her chair without difficulty. (See page 6 above.) Roche had full flexion, extension, rotary movement and lateral flexion bilaterally in her cervical spine; no scoliosis, kyphosis or abnormality in the thoracic spine; and full lateral flexion bilaterally. (See pages 6-7 above.) Roche had full range of motion in her shoulders, elbows, forearms and wrists bilaterally; full range of motion in her hips, knees and ankles bilaterally; and no evident subluxations, contractures, ankylosis or thickening. (See page 7 above.) Roche's joints were stable and non-tender with no redness, heat, swelling or effusion, and no cyanosis, clubbing, edema or muscle atrophy was evident in her extremities. (Id.) Roche's deep tendon reflexes were "physiologic and equal in [her] upper and lower extremities," with no sensory deficit. (Id.)

ALJ Stacchini also correctly noted that Dr. Shah's notes indicate that Roche's motor, sensory and reflex functions were largely normal. On January 21, February 20, May 19, June 19, July 28, August 25 and December 22, 2015, Roche had normal motor and sensory function, intact and symmetrical deep tendon reflexes bilaterally, and a normal gait. (See pages 10-11 above.) And, although Dr. Lee found that Roche had diminished tendon reflexes, he also found on two occasions that Roche had 5/5 strength throughout and a normal gait, and a "[s]ensory examination demonstrate[d] intact pinprick and light touch sensation of bilateral upper and lower extremities." (See page 8 above.)

The Court accordingly finds that, while ALJ Stacchini should have better explained his Listing analysis, his determination that Roche did not meet Listing 1.04 was supported by

substantial evidence discussed elsewhere in the decision.[16]

### D. ALJ Stacchini's Credibility and RFC Determinations

Before proceeding to step four, the Court will address ALJ Stacchini's credibility and residual functional capacity ("RFC") determinations.

#### 1. Credibility Determination

Because subjective symptoms only lessen a claimant's RFC where the symptoms "'can reasonably be accepted as consistent with the objective medical evidence and other evidence,' the ALJ is not required to accept allegations regarding the extent of symptoms that are inconsistent with the claimant's statements or similar evidence." Moulding v. Astrue, 08 Civ. 9824, 2009 WL 3241397 at *7 (S.D.N.Y. Oct. 8, 2009) (citation & emphasis omitted).[17]  In addition, "courts must

_____

[16]   Roche further argues in her reply brief that, "[b]eyond the failure to analyze if Roche meets the Listing [1.04(A)] argued, both the ALJ and the Appeals Council . . . failed to determine if Roche's impairments equaled the Listing." (Dkt. No. 23: Roche Reply Br. at 3.) See, e.g., Bellamy v. Astrue, No. 08-CV-0628, 2010 WL 2025489 at *9 (W.D.N.Y. Mar. 30, 2010) ("If the impairments are listed in the Appendix, and the duration requirement is satisfied, the impairment or impairments are considered severe enough to prevent the claimant from performing any gainful activity and the claimant is considered disabled.  Absent a Listed Impairment, if a claimant alleges an impairment that is not specifically listed in the regulations under the Listing of Impairments, a determination of medical equivalence is required." (citations omitted)), R. & R. adopted as modified, 2010 WL 2025486 (W.D.N.Y. May 20, 2010).  However, ALJ Stacchini analyzed the evidence related to Roche's motor, sensory and reflex functioning as relevant to Listing 1.04(A), and Roche makes no specific equivalency argument aside from the vague claim (with no record citations) that some unspecified impairments might have equaled a Listing.  (See generally Roche Reply Br.)

[17]   See, e.g., Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) ("As for the ALJ's credibility determination, while an ALJ 'is required to take the claimant's reports of pain and other limitations into account,' he or she is 'not require[d] to accept the claimant's subjective complaints without question.'  Rather, the ALJ 'may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'" (citations omitted)); Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010); Brown v. Comm'r of Soc. Sec., 310 F. App'x 450, 451 (2d Cir. 2009) ("'Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings.'"); Rivers v. Astrue, 280 F. App'x (continued...)

show special deference to an ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor while [the plaintiff was] testifying." Marquez v. Colvin, 12 Civ. 6819, 2013 WL 5568718 at *7 (S.D.N.Y. Oct. 9, 2013).[18] Thus, "[i]f the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints." Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (citations omitted).

       When an ALJ determines that a claimant's own statements regarding her symptoms are not supported by the record, that "determination or decision must contain specific reasons for

---

[17] (...continued)
20, 22 (2d Cir. 2008) (same); Thompson v. Barnhart, 75 F. App'x 842, 845 (2d Cir. 2003) (ALJ properly found that plaintiff's "description of her symptoms was at odds with her treatment history, her medication regime, and her daily routine"); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999); Norman v. Astrue, 912 F. Supp. 2d 33, 85 (S.D.N.Y. 2012) ("It is 'within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology.'"); Astolos v. Astrue, No. 06-CV-678, 2009 WL 3333234 at *12 (W.D.N.Y. Oct. 14, 2009) (ALJ properly determined that plaintiff's subjective pain complaints were not supported by the medical record); Speruggia v. Astrue, No. 05-CV-3532, 2008 WL 818004 at *11 (E.D.N.Y. Mar. 26, 2008) ("The ALJ 'does not have to accept plaintiff's subjective testimony about her symptoms without question' and should determine a plaintiff's credibility 'in light of all the evidence.'"); Soto v. Barnhart, 01 Civ. 7905, 2002 WL 31729500 at *6 (S.D.N.Y. Dec. 4, 2002) ("The ALJ has the capacity and the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of pain alleged by the claimant."); Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (same).

[18] Accord, e.g., Campbell v. Astrue, 465 F. App'x at 7 ("[W]e have long held that '[i]t is the function of the [Commissioner], not ourselves, . . . to appraise the credibility of witnesses, including the claimant.'"); Nunez v. Astrue, 11 Civ. 8711, 2013 WL 3753421 at *7 (S.D.N.Y. July 17, 2013); Guzman v. Astrue, 09 Civ. 3928, 2011 WL 666194 at *7 (S.D.N.Y. Feb. 4, 2011); Ruiz v. Barnhart, 03 Civ. 10128, 2006 WL 1273832 at *7 (S.D.N.Y. May 10, 2006); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 & n.6 (S.D.N.Y. 1995); Mejias v. Soc. Sec. Admin., 445 F. Supp. 741, 744 (S.D.N.Y. 1978) (Weinfeld, D.J.); Wrennick v. Sec'y of Health, Educ. & Welfare, 441 F. Supp. 482, 485 (S.D.N.Y. 1977) (Weinfeld D.J.).

the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186 at *2 (July 2, 1996).[19/] The regulations set out a two-step process for assessing a claimant's statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . . If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record. The ALJ must consider statements the claimant or others make about his impairment(s), his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.

Genier v. Astrue, 606 F.3d at 49 (quotations, citation & brackets omitted) (citing 20 C.F.R.

---

[19/]     In March 2016, the SSA released SSR 16-3p, which provides updated guidance on evaluating a claimant's assertions about the work-preclusive nature of her symptoms. See generally SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016); see also, e.g., Duran v. Colvin, 14 Civ. 8677, 2016 WL 5369481 at *13 n.27 (S.D.N.Y. Sept. 26, 2016) ("SSR 16-3p supersedes SSR 96-7p, 1996 WL 374186 (July 2, 1996), and clarifies the policies set forth in the previous SSR."). SSR 16-3p, however, was not made retroactive and the Court therefore applies SSR 96-7p as the ruling in effect at the time of the ALJ's decision in this case. See, e.g., Crampton v. Comm'r of Soc. Sec., No. 16-CV-0356, 2017 WL 2829515 at *6 n.3 (N.D.N.Y. June 29, 2017); Smith v. Colvin, No. 14-CV-1752, 2016 WL 1170910 at *7 n.3 (D. Conn. Mar. 23, 2016). In any event, the substance of the two-step process for evaluating claimants' symptoms discussed herein was not modified by SSR 16-3p. Accord SSR 16-3p, 2016 WL 1119029 at *3-4; see also, e.g., Burgess v. Colvin, 15 Civ. 9585, 2016 WL 7339925 at *11 (S.D.N.Y. Dec. 19, 2016) (citing SSR 16-3p for an explanation of the two-step process for assessing claimants' statements about their symptoms). Rather, SSR 16-3p's updated guidance is a matter of emphasis: whereas SSR 96-7p "placed a stronger emphasis on the role of the adjudicator to make a 'finding about the credibility of the individual's statements about the symptom(s) and its functional effects' . . . S.S.R. 16-3p espouses a more holistic analysis of the claimant's symptoms, and 'eliminate[s] the use of the term "credibility"' from sub-regulation policy." Acosta v. Colvin, 15 Civ. 4051, 2016 WL 6952338 at *18 (S.D.N.Y. Nov. 28, 2016).

§§ 404.1529(a), 404.1529(b), and the now-superseded SSR 96-7p).

In Roche's more recent function report, she stated that her impairments prevented her from "work[ing], stand[ing], bend[ing], lift[ing], . . . clean[ing]" and sleeping through the night. (See page 3 above.) Roche stated that lifting, standing, walking, sitting, climbing stairs, kneeling, squatting, reaching and using her hands caused her pain, and that she could walk for 15 minutes before needing to stop and rest for five minutes. (Id.) At the hearing before ALJ Stacchini, Roche testified that, even with the spinal cord stimulator implant, which only helped alleviate her pain from "an 11" to a six or seven, she could not "sit at a desk for most of the day" because she could only sit for 20 minutes before she would have to get up and walk around. (See pages 4-5 above.) According to Roche, she could not perform a job that required constant standing due to her pain. (See page 5 above.) Roche additionally complained of right hand arthritis, which prevented her from carrying anything using that hand. (Id.) At the hearing, Roche testified that she had not been to the grocery store in three years, and the only errand she performed during that time was to check her mailbox. (See page 4 above.) Roche testified that she had not used public transportation since October 2013, and did no chores except feed her cat and "very light" cleaning such as wiping the counter. (Id.) Roche further stated that she had not cooked a meal besides making coffee and toast since October 2013, and relied on her daughter to bring her meals. (Id.)

ALJ Stacchini reviewed Roche's testimony and the record evidence. (R. 33-42.) ALJ Stacchini found that although Roche's medically determinable impairments could be expected to produce the alleged symptoms, Roche's statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely credible. (See page 19 above.) ALJ Stacchini found that Roche's neck and back pain "did not limit her to the extent alleged." (Id.) "The record reveal[ed] that Roche had pain symptoms that prompted her to have epidural injections and surgery

for a spinal cord stimulator which resulted in good control of her symptoms." (Id.) The medical records indicated that Roche's neck pain was intermittent, and that she did not have significant upper extremity limitations "as she had full range of motion in the movement of her shoulders, elbows, forearms or wrists." (Id.) While Roche "had a history of right hand osteoarthritis, the record did not establish restrictions in hand functioning consistent with Dr. Kaci's examination." (Id.)

To support his conclusion regarding Roche's physical impairments, ALJ Stacchini cited a number of records from Dr. Kaci and Dr. Shah that included normal findings. (See pages 15-19 above.) In particular, ALJ Stacchini noted that Dr. Kaci reported that Roche had a normal gait and stance, no difficulty changing for the examination or getting on and off of the examination table, "intact hand and finger dexterity, full strength on grip, and no restrictions in the range of motion of her shoulders, elbows, forearms and wrists[] bilaterally." (See pages 15-16 above.) ALJ Stacchini also noted that Dr. Shah's examination findings in January, February, June, August and December 2015 "did not establish abnormalities, consistent with Dr. Kaci's findings of February 2014." (See page 16 above.) Moreover, ALJ Stacchini noted that Roche underwent a spinal cord stimulator procedure in August 2015 and, "[t]hereafter, the evidence reveal[ed] that she was responsive to treatment." (See page 17 above.) Roche told her treating doctors "that she could ambulate and perform her activities of daily living significantly better," and "had a decrease in the use of narcotic pain medication." (Id.) "By October 2015, a physical examination, post-operation, revealed that [Roche] had no pain, was doing very well and was happy." (Id.)

As to activities of daily living, ALJ Stacchini found that Roche's statements were "not consistent with other statement[s] in the record," as Roche admitted to cooking three times per week in her function report and Dr. Kaci found that Roche "remained independent in her personal care needs even though she complained of difficulties." (See page 15 above.) Roche's treatment records

with other physicians also indicated that Roche was "able to complete her activities of daily living and perform household chores." (Id.)

ALJ Stacchini appropriately applied the two-part credibility test and supported his findings with substantial evidence in Roche's treatment records regarding her physical impairments. Dr. Kaci's examination report includes numerous normal findings, as ALJ Stacchini noted. Roche informed Dr. Kaci that she cooked three times a week, cleaned once a month, showered twice a week, dressed herself four times a week, and went to doctor's appointments. (See page 6 above.)[20/] Roche appeared in no acute distress, had a normal gait and stance, could walk on heels with difficulty, fully squat, used no assistive devices, needed no help changing or getting on and off of the examination table, and could rise from her chair without difficulty. (See page 6 above.) Roche had full flexion, extension, rotary movement and lateral flexion bilaterally in her cervical spine; no scoliosis, kyphosis or abnormality in the thoracic spine; and full lateral flexion bilaterally. (See pages 6-7 above.) Roche had full range of motion in her shoulders, elbows, forearms and wrists bilaterally; full range of motion in her hips, knees and ankles bilaterally; and no evident subluxations, contractures, ankylosis or thickening. (See page 7 above.) Roche's joints were stable and non-tender with no redness, heat, swelling or effusion, and no cyanosis, clubbing, edema or muscle atrophy was evident in her extremities. (Id.) Roche's hand and finger dexterity were intact and her grip strength was 5/5 bilaterally. (Id.) Dr. Kaci concluded that Roche had mild limitations to sitting and standing, and moderate limitations to walking, in contrast to Roche's more extreme

---

[20/] The Court also notes that Roche's testimony that she had not cooked a meal since October 2013 starkly contradicted her February 4, 2014 function report in which she stated that she prepared her own meals four to eight times a week. (See pages 3-4 above.) When ALJ Stacchini pointed out this inconsistency, Roche admitted that she had cooked but only one time, again in contrast to her function report and her previous hearing testimony. (See page 4 above.)

self-assessment.  (Id.)

As to Dr. Shah's records cited by ALJ Stacchini, on January 21, February 20, May 19, June 19, July 28, August 25 and December 22, 2015, Roche had normal motor and sensory function, intact and symmetrical deep tendon reflexes bilaterally and a normal gait.  (See pages 9-12 above.)  Dr. Lee also found on two occasions that Roche had 5/5 strength throughout and a normal gait, and a "[s]ensory examination demonstrate[d] intact pinprick and light touch sensation of bilateral upper and lower extremities."  (See page 8 above.)

Finally, ALJ Stacchini correctly found that Roche's spinal cord stimulator procedure was successful, and the records from Drs. Gitkind and Yassari undercut Roche's statements regarding the severity of her pain following the implant.  On July 15, 2015, Roche attended a follow up visit with Dr. Gitkind "5 days after implantation of a trial spinal cord stimulation."  (See page 13 above.)  Roche reported that she was in no pain, and had "been virtually pain-free" during the five day trial; Roche stated "that her activity level ha[d] significantly improved as [did] her overall mood."  (Id.)  Roche had not used any pain medication or an assistive device when walking during the trial.  (Id.)  On August 27, 2015, Roche stated that "[w]ith the trial in place she fe[lt] 65% better, ha[d] improved balance and gait, [and could] ambulate and perform her ADLs significantly better." (Id.)  On October 28, 2015, Roche had a post-operative physical examination following the permanent implantation, during which she reported that she was "doing very well," was "very happy" and was in no pain.  (Id.)

ALJ Stacchini supported his credibility determination with substantial evidence in Roche's treatment records.

## 2.    Residual Functional Capacity Determination

ALJ Stacchini found that Roche had the ability to perform sedentary work as defined

in 20 C.F.R. § 404.1567(b), except that she

> can occasionally climb stairs and ramps, and never climb ladders or scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. She needs to avoid unprotected heights, moving mechanical parts and atmospheric conditions. She can frequently handle and finger with her right hand. She is limited to simple and routine tasks with occasional interaction with coworkers, supervisors and the general public.

(See page 15 above.)

> Sedentary work involves:
>
> lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

ALJ Stacchini explained his reasoning in his RFC analysis, separately addressing Roche's difficulty walking, right-hand limitations, neck pain, and severe back and lower extremity pain. (See pages 15-19 above.)

First, ALJ Stacchini wrote that although Roche alleged limited mobility and difficulty walking, Dr. Kaci reported that Roche had a normal gait and stance, and had no difficulty changing for the examination or getting on and off of the examination table. (See page 15 above.) ALJ Stacchini accordingly found that Roche's "allegations that she could walk for up to 10 minutes with rest periods of up to 20 minutes [we]re not persuasive." (Id.) While Roche alleged severe back pain, stiffness and muscle spasms, ALJ Stacchini gave "little weight" to Dr. Kaci's opinion that Roche had a marked limitation bending, lifting and carrying, as inconsistent with her examination findings. (See page 17 above.) ALJ Stacchini found that Roche could "occasionally stand and/or walk for up to 2 hours of an 8-hour workday, consistent with the sedentary level of exertion." (Id.)

Second, ALJ Stacchini found that Roche could frequently handle and finger with her dominant right hand; notwithstanding Roche's right hand osteoarthritis, Dr. Kaci found that Roche "had intact hand and finger dexterity, full strength on grip, and no restrictions in the range of motion of her shoulders, elbows, forearms and wrists[] bilaterally." (See page 16 above.) Dr. Kaci, moreover, included no limitations in hand functioning. (Id.)

Third, as to Roche's neck pain, ALJ Stacchini wrote that Dr. Shah's examination findings in January, February, June, August and December 2015 "did not establish abnormalities, consistent with Dr. Kaci's findings of February 2014." (Id.) Dr. Kaci "observed symmetrical reflexes and no motor or sensory abnormalities" were reported in Roche's physical examinations with Dr. Shah. (Id.) ALJ Stacchini nevertheless acknowledged that the laboratory findings regarding Roche's cervical spine supported her neck pain allegations, but did "not support the intensity of her alleged symptoms or radicular pain in the upper extremity." (Id.) Dr. Kaci wrote that Roche had full range of motion in her neck, joints and upper extremities including her shoulders, elbows, forearms and wrists bilaterally. (Id.) However, Dr. Kaci observed decreased strength in Roche's upper extremities rated a 4/5, which supported some decreased capacity to exert force. (Id.) ALJ Stacchini addressed this limitation by limiting Roche to a range of sedentary work. (Id.)

Fourth, ALJ Stacchini noted that Roche claimed that she could not lift anything heavier than ten pounds in her Appeals Disability Report, which conflicted with Dr. Shah's opinion that Roche could only occasionally lift up to five pounds. (Id.) Dr. Shah's opinion on Roche's ability to lift was given little weight as Roche "admitted she could lift heavier objects, equivalent to sedentary work." (See pages 16-17 above.)

Fifth, ALJ Stacchini addressed Roche's alleged degenerative changes in her lower

extremities, and limitations climbing stairs, kneeling and squatting. (See page 17 above.) ALJ Stacchini stated that Dr. Kaci's examination did not reveal joint instability, redness, heat, swelling or effusion, and Roche had full range of motion in her lower extremity joints. (Id.) ALJ Stacchini wrote that aside from positive straight leg raise tests bilaterally at 45 degrees on the right and 30 degrees on the left, "the evidence did not support a sensory deficit." (See pages 17-18 above.) Roche had some decrease in strength bilaterally, which was consistent with Dr. Shah's findings, but Dr. Shah reported a positive straight leg raise test at 50 degrees bilaterally "with greater functionality as compared to Dr. Kaci's findings." (See page 18 above.) Thus, considering Dr. Kaci and Dr. Shah's findings, ALJ Stacchini found that Roche could occasionally climb stairs and ramps, and never climb ladders or scaffolds, due to the degenerative changes in her lower extremities. (Id.)

Sixth, ALJ Stacchini found that Dr. Kaci's conclusion that Roche had marked limitations bending was inconsistent with the evidence. (Id.) Dr. Kaci observed that Roche had full lateral flexion bilaterally, with limited forward flexion and extension at 30 degrees. (Id.) Dr. Shah reported no neurological deficits and described Roche as alert and in no acute distress, and in September 2015, Dr. Yassari reported that Roche's symptoms had improved. (Id.) Thus, ALJ Stacchini wrote that the record did not support a marked bending limitation, and that Roche could occasionally stoop. (Id.)

ALJ Stacchini also explained why he gave Dr. Shah's "medical source statement with significant restrictions . . . little weight." (Id.) ALJ Stacchini wrote that Dr. Shah opined in December 2015 that Roche was limited to thirty minutes of sitting, and between thirty minutes and an hour of standing and/or walking, before needing to change positions. (Id.) However, ALJ Stacchini gave "little weight" to this portion of Dr. Shah's opinion because it was not supported by Dr. Shah's own examination findings or Dr. Siddique's June 2015 examination. (Id.) Roche

repeatedly had "symmetrical deep tendon reflexes," and ALJ Stacchini found that "the extreme findings" were inconsistent with other evidence showing that Roche was "independent with her activities of daily living" and responded well to treatment.  (Id.)

ALJ Stacchini noted that Roche's medical records following her spinal cord stimulator implant showed her symptoms were improving.  While Roche's "laboratory studies support[ed] the presence of degenerative changes" attributable to Roche's symptoms, such as her September 2014 MRI, she underwent the spinal cord stimulator procedure in August 2015 and, "[t]hereafter, the evidence reveal[ed] that she was responsive to treatment."  (See page 17 above.) Roche reported "that she could ambulate and perform her activities of daily living significantly better," and "had a decrease in the use of narcotic pain medication."  (Id.)  "By October 2015, a physical examination, post-operation, revealed that [Roche] had no pain, was doing very well and was happy."  (Id.)

ALJ Stacchini's findings are supported by substantial evidence in Roche's treatment records.  As detailed more thoroughly above (see pages 36-39 above), Dr. Kaci's report included multiple normal physical findings, as did Dr. Shah's records.  Moreover, following her spinal cord stimulator procedure, Roche had a post-operative physical examination during which she reported that she was "doing very well," was "very happy" and was in no pain.  (See page 13 above; see also Dkt. No. 18: Roche Br. at 20 (Roche's "condition changed over time with regard to pain; for the worse at the beginning; for the better after the implant.").)  Although Roche claims that ALJ Stacchini committed reversible error by focusing on Roche's activities of daily living "to discount Dr. Shah's opinions and Roche's statements regarding the pain she experiences" (Roche Br. at 19), ALJ Stacchini's decision was far more comprehensive and relied on the objective medical evidence from Drs. Kaci, Shah, Gitkind and Yassari.

For the same reasons, ALJ Stacchini's rejection of Dr. Shah's opinion was not improper. (Roche Br. at 20-21.) ALJ Stacchini provided good reasons, supported by citations to the record, for rejecting Dr. Shah's opinion, namely that it was inconsistent with his own records and other medical evidence indicating that Roche responded well to treatment. See, e.g., Micheli v. Astrue, 501 F. App'x 26, 28 (2d Cir. 2012) ("A physician's opinions are given less weight when his opinions are internally inconsistent."); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) ("Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, the opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." (citation omitted)).[21]

ALJ Stacchini supported his RFC determination with substantial evidence in Roche's treatment records.[22]

---

[21] Moreover, in reaching his determination, ALJ Stacchini did not "pick and choose" only the evidence favorable to his RFC determination. See, e.g., Clarke v. Colvin, 15 Civ. 354, 2017 WL 1215362 at *9 (S.D.N.Y. Apr. 3, 2017) ("'While the ALJ had cast doubt upon the findings of [treating physician Dr. Naco], as discussed above, he generally accepted [Dr. Reddy's] findings without explaining why they were more valid. This suggests that the ALJ selectively relied on evidence that weighed against a finding of a disability. This is improper—an ALJ may not "pick and choose evidence which favors a finding that the claimant is not disabled."'"). For example, ALJ Stacchini discussed Roche's MRI studies that indicated degenerative changes and nerve root compression, Dr. Kaci's observation of decreased strength in Roche's upper extremities, and the positive straight leg raise tests noted by Drs. Kaci and Shah, and weighed these records against the backdrop of Roche's full medical history.

[22] Given this determination, the Court does not address Roche's argument that the ALJ relied on flawed testimony from the vocational expert. (Roche Br. at 21 ("As a result of improperly weighing Dr[.] Shah's opinion the ALJ relied on vocational testimony that cannot be seen as substantial evidence as it does not properly describe Roche's limitations.").)

**E.**     **Roche Did Not Have The Ability to Perform Her Past Relevant Work**

The fourth step of the five-step analysis asks whether Roche had the residual functional capacity to perform her past relevant work.  (See page 23 above.)  Roche previously worked as a home health aide, security guard and restaurant supervisor.  (See page 2 above.)  ALJ Stacchini concluded that Roche did not have the ability to perform her past relevant work.  (See page 19 above.)  Because this finding favors Roche, the Court proceeds to the fifth and final step of the analysis.

**F.**     **There Are Jobs In Substantial Numbers In The Economy That Roche Can Perform**

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only his physical capability, but as well his age, his education, his experience and his training."  Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980).[23/]

In meeting his burden under the fifth step, the Commissioner:

> may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid".  The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience.  Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy.  Generally the result listed in the Grid is dispositive on the issue of disability.

Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fn. omitted); see, e.g., Heckler v.

---

[23/]     See, e.g., Roma v. Astrue, 468 F. App'x 16, 20 (2d Cir. 2012); Arruda v. Comm'r of Soc. Sec., 363 F. App'x 93, 95 (2d Cir. 2010); Butts v. Barnhart, 388 F.3d 377, 381 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

Campbell, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the promulgation of the Grid); Roma v. Astrue, 468 F. App'x at 20-21; Martin v. Astrue, 337 F. App'x 87, 90 (2d Cir. 2009); Rosa v. Callahan, 168 F.3d at 78; Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).

However, "relying solely on the Grids is inappropriate when nonexertional limitations 'significantly diminish' plaintiff's ability to work so that the Grids do not particularly address plaintiff's limitations." Vargas v. Astrue, 10 Civ. 6306, 2011 WL 2946371 at *13 (S.D.N.Y. July 20, 2011); see also, e.g., Travers v. Astrue, 10 Civ. 8228, 2011 WL 5314402 at *10 (S.D.N.Y. Nov. 2, 2011) (Peck, M.J.), R. & R. adopted, 2013 WL 1955686 (S.D.N.Y. May 13, 2013); Lomax v. Comm'r of Soc. Sec., No. 09-CV-1451, 2011 WL 2359360 at *3 (E.D.N.Y. June 6, 2011) ("Sole reliance on the grids is inappropriate, however, where a claimant's nonexertional impairments 'significantly limit the range of work permitted by his exertional limitations.'").

Rather, where the claimant's nonexertional limitations "'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (quoting Bapp v. Bowen, 802 F.2d at 605); see also, e.g., Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) ("We have explained that the ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert."); Rosa v. Callahan, 168 F.3d at 82 ("Where significant nonexertional impairments are present at the fifth step in the disability analysis, however, 'application of the grids is inappropriate.' Instead, the Commissioner 'must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'" (quoting & citing Bapp v. Bowen, 802 F.2d at 603, 605-06)); Suarez v. Comm'r of Soc. Sec., No.

09-CV-338, 2010 WL 3322536 at *9 (E.D.N.Y. Aug. 20, 2010) ("If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." (quoting <u>Zabala</u> v. <u>Astrue</u>, 595 F.3d at 411)).

ALJ Stacchini properly relied on the testimony of vocational expert Robert Baker, who testified that a person with Roche's RFC could not perform her past work, but could perform the jobs of addresser, document preparer, and cutter and paster. (<u>See</u> page 5 above.) These jobs are sedentary, unskilled positions, and Baker testified that they all exist in significant numbers in the national economy. (<u>Id.</u>) ALJ Stacchini relied upon Baker's testimony in reaching his step five determination when he specifically referred to those jobs in his findings. (<u>See</u> page 20 above.) Accordingly, ALJ Stacchini's decision at step five was supported by substantial evidence. <u>See</u>, <u>e.g.</u>, <u>Rodriguez</u> v. <u>Berryhill</u>, 16 Civ. 8752, 2017 WL 3701220 at *20 (S.D.N.Y. Aug. 28, 2017) (Peck, M.J.).

## <u>CONCLUSION</u>

For the reasons set forth above, the Commissioner's determination that Roche was not disabled within the meaning of the Social Security Act during the period from October 28, 2013 through March 24, 2016 is supported by substantial evidence. Accordingly, the Commissioner's motion for judgment on the pleadings (Dkt. No. 21) is <u>GRANTED</u> and Roche's motion (Dkt. No. 17) is <u>DENIED</u>.

Dated:      New York, New York
          January 25, 2018

_____
**Andrew J. Peck**
United States Magistrate Judge

Copies ECF to:     All Counsel